*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

GORDON MITCHNER,

        Plaintiff-Appellant,

v

PROGRESSIVE MICHIGAN INSURANCE
COMPANY and PROGRESSIVE MARATHON
INSURANCE COMPANY,

        Defendants,

and

THOMAS JAY GAFFNEY and CHRISTINE
GAFFNEY,

        Defendants-Appellees.

UNPUBLISHED
June 23, 2022

No. 356698
St. Clair Circuit Court
LC No. 19-001865-NI

Before: GADOLA, P.J., and BORRELLO and M. J. KELLY, JJ.

PER CURIAM.

Plaintiff appeals as of right the order granting summary disposition to defendants, Thomas Jay Gaffney and Christine Gaffney,[1] in this automobile negligence action. For the reasons set forth in this opinion, we reverse.

## I. FACTUAL BACKGROUND

---

[1] We will refer to Thomas and Christine by first name when referring to them individually, but we will refer to them jointly as defendants. Additionally, although Progressive Marathon Insurance Company and Progressive Michigan Insurance Company were both originally defendants in this action, all parties stipulated to dismiss them as defendants before the summary disposition motion was filed. Neither Progressive Insurance entity is a party to this appeal.

This case arises out of a September 4, 2016 motor vehicle accident in which a vehicle driven by Thomas collided with the rear of a vehicle driven by plaintiff as plaintiff was making a right turn. Plaintiff believed that he lost consciousness after the collision. Upon regaining consciousness, plaintiff declined to go to the hospital, however, plaintiff testified during his deposition that he "couldn't move" when he woke up the next morning and that he subsequently drove himself to the hospital.

Plaintiff's emergency department records from his hospital visit on September 5, 2016, indicated that plaintiff had been in a motor vehicle accident the previous night. Under the heading "Clinical Impression," it was stated that plaintiff had a head injury, neck sprain, back sprain, and cervical disc herniation. A CT scan of plaintiff's cervical spine was performed that day. According to the CT scan report signed by Dr. Hafeez Ahmed, M.D., plaintiff was found to have a "large disc herniation at C3-C4 causing moderate central spinal canal stenosis[] probably flattening the ventral cord." It was also documented in the report findings that "[w]hile there is very mild endplate spondylosis such as at C3-C4 and C4-C5, there is a large central disc protrusion at C3-C4 contributing to moderate central spinal canal stenosis." The report further indicated that "[a]n acute posttraumatic disc herniation is not excluded." There was no acute fracture of the cervical spine. Plaintiff was prescribed pain medication. According to plaintiff, he was also given a neck brace.

Plaintiff testified in his deposition that at the time of the accident in September 2016, he was employed as a carpenter working in construction. However, due to plaintiff's cervical strain, Dr. Charbal Bazo, M.D., disabled plaintiff from working for 10 days until September 23, 2016.

On September 23, 2016, plaintiff received further medical treatment with Dr. Nick Reina, M.D., for worsening neck and back pain, including his neck strain. His records from office visits with Reina on October 4 and 21, 2016, indicated that plaintiff's symptoms had remained the same regarding his back and neck pain. These records also indicate that Reina disabled plaintiff from working during this time due to his neck and upper back pain and that Reina diagnosed plaintiff with strains of muscles and tendons in the neck, as well as acute pain due to trauma, intravertebral disc disorders, and chronic pain syndrome. Treatment records from plaintiff's physical therapy appointment in October 2016 indicate that he was being treated for cervical pain, including two herniated discs, and that plaintiff had functional difficulty with sleeping, lifting, twisting, reaching above his head, dressing, housework, and yardwork, whereas he had been functionally independent before the motor vehicle accident injury. Records from plaintiff's November 4, 2016 appointment with Reina state that plaintiff's pain had improved, although he still experienced moderate neck and lumbar pain, and that plaintiff could return to work on November 28.

Additional medical records show that plaintiff was treated at the hospital for complaints of chest pain on July 21, 2017, that he was treated at the hospital for a headache on March 23, 2018, and that he was treated at the hospital for complaints of left knee pain on December 30, 2018. Records from a March 22, 2018 visit with Reina indicate that plaintiff reported that his neck and back pain symptoms were controlled with current regimen that included pain medication. At this visit, plaintiff also apparently reported increase in pain due to working 7 days a week.

Plaintiff had an MRI of his cervical and lumbar spine on April 22, 2019. The MRI report indicates that plaintiff had a "[p]ersistent large disc herniation C3-C4 level effacing the anterior

thecal sac and causing flattening of the ventral surface spinal cord" with "[n]o significant progression from 2016 CT." There was also a "tiny central disc protrusion" at the C4-C5 level.

Plaintiff testified that he never used a crutch, cane, or back brace before the accident but that after the accident, he had to use a back brace whenever he worked. Plaintiff also used a neck brace for approximately six months after the accident, pursuant to instructions from the hospital, but he no longer used it by the time of his deposition. Plaintiff testified that he needed to use a cane for approximately two years after the accident to prevent losing his balance. Plaintiff testified that at the time of his deposition in June 2020, he was not currently restricted by any doctor from working. Additionally, plaintiff testified that since the accident, he could no longer sit up straight for long periods of time like he was previously able to do because he was constantly "adjusting [him]self to get comfortable." He no longer played basketball, although he had not played in any kind of league before the accident, and he no longer went jogging or lifted weights. Plaintiff stated that cutting the grass took him longer than it did before the accident and now caused him so much pain that he had "to lay up for a day or so to get [him]self back together." According to plaintiff, he could no longer play or run around with his kids, or pick them up, like he could before the accident.[2] Plaintiff testified that his back sometimes "lock[ed] up" now while he was driving and that this never happened before the accident. Plaintiff stated, "I try to get people over to help me out a lot, so I always have people at my house now to help me out with stuff that I'm not able to do on my own anymore."

An x-ray report regarding an x-ray on plaintiff's cervical spine from approximately one year before the accident, performed on September 22, 2015, found plaintiff to have mild degenerative changes; hypertrophic spondylosis at C4-C5, C5-C6 and C6-C7; "reasonably well maintained" disc spaces; and normal prevertebral soft tissues. An x-ray report from February 2016 indicated regarding plaintiff's cervical spine that there was "[n]o predental space widening, or prevertebral soft tissue swelling" and that there was "[m]ild multilevel endplate spondylosis within the cervical spine." The same x-ray report stated that there were "[f]ive lumbar type vertebral bodies with facet arthropathy in the lower lumbar spine" and "[m]inimal endplate spondylosis." Plaintiff testified that at some point approximately one week before the accident at issue in this case, he had an MRI on his back because his back "was hurting" and he was told that "part of my whatever this was was deteriorating." There is also record evidence that plaintiff had a history of treatment for neck and back pain before the subject accident.

## II. PROCEDURAL HISTORY

Plaintiff initiated this action asserting a negligence claim against Thomas, as well as ownership-liability and negligent entrustment claims against Christine.[3] According to plaintiff's deposition testimony, he claimed to have suffered injuries to his neck and back as a result of this accident. Plaintiff specifically explained that he had been diagnosed with two herniated discs in his neck. He testified that Dr. Marwan Shuayto, M.D. provided a diagnosis regarding plaintiff's

---

[2] Plaintiff acknowledged that his children did not reside with him.

[3] As previously noted, the claims that plaintiff asserted against Progressive are not at issue on appeal. We therefore need not discuss them.

back and gave him injections, but plaintiff did not remember the specific diagnosis. Plaintiff submitted medical records indicating that Shuayto administered injections to plaintiff's lumbar region in September 2019 to treat chronic low back pain, lumbar facet joint arthropathy, and lumbar spondylosis without myelopathy.

Defendants moved for summary disposition under MCR 2.116(C)(10). Defendants argued that plaintiff had a long history of neck and back complaints and could not show that his alleged neck and back injuries were caused by the September 4, 2016 motor vehicle accident rather than merely being pre-existing conditions. Defendants also argued that plaintiff could not establish that the accident resulted in a serious impairment of body function under MCL 500.3135 and *McCormick v Carrier*, 487 Mich 180; 795 NW2d 517 (2010), because plaintiff had not presented evidence that the accident caused an objectively manifested impairment or affected his general ability to lead his normal life. With respect to the effect on plaintiff's ability to lead his normal life, defendants argued that plaintiff continued to work after the accident and that the issues plaintiff experienced after the accident were the same as those he experienced before the accident.

In support of their arguments, defendants relied heavily on two (what defendant calls) "independent" medical examination reports.[4] Dr. Adeel Khalid, M.D., reviewed plaintiff's relevant radiological examinations and opined that that the CT scan of plaintiff's cervical spine from the day after the subject accident showed no acute fracture, subluxation, hemorrhage, edema, displacement of intervertebral discs, or injury of paraspinal soft tissues or craniocervical junction. Khalid concluded that the CT scan only showed degenerative changes and mild arthritis. Acknowledging the large disc herniation at C3-C4, Khalid opined that this was only a chronic condition based on what the imaging showed regarding the condition of surrounding bones and ligaments, as well as the lack of changes in the appearance of this herniation between the September 5, 2016 imaging and the April 22, 2019 imaging. Khalid stated that he "disagree[d]" with Ahmed's findings in the original radiology report from the September 5, 2016 CT scan that an acute posttraumatic disc herniation was not excluded with respect to the herniation at C3-C4. Khalid opined that plaintiff's lumbar spine imaging only reflected degenerative changes that had remained stable when compared to pre-accident imaging. Khalid concluded:

> Based upon the submitted radiology examinations of the complete spine, there are no objective findings of objective acute injuries. Age-appropriate diffuse degenerative changes of the cervical spine, thoracic spine and lumbar spine are present and unchanged when compared to relevant pre-accident radiology examinations.

---

[4] As this Court has noted, although IMEs are typically referred to as "independent medical examinations," the "independence" of these examinations is "questionable" since "an IME involves obtaining a second opinion from a doctor who is entirely selected and paid for by an insurance company." *Micheli v Mich Auto Ins Placement Facility*, ___ Mich App ___, ___ n 3; ___ NW2d ___ (2022) (Docket No. 356559); slip op at 2 n 3. It is more accurate to refer to such an examination as an "insurance medical examination."

-4-

Additionally, Dr. Khawaja Ikram, D.O., opined as follows:[5]

Based on the information provided with medical records along with the physical examination and the lack of objective findings, I believe that Mr. Mitchner sustained sprains/strains of cervical and lumbar spine, has a chronic history of neck and low back pain which he has been treated since 2014, if not sooner. Unfortunately, the records will no go back to 2014. He has been treated by Dr. Bazo and also Dr. Reina as a pain specialist.

Usually sprains and strains resolve over a two- to three-month period through conservative measures such as medications, injections and therapies along with possible chiropractic intervention. At this point, he has done all that and continues to have subjective complaints of cervical and lumbar findings with very minimal objective findings. I believe that the initial sprain/strain to the cervical and lumbar spine has gone on to resolve. Unfortunately, he does have some degenerative changes which were pre-existing prior to the auto accident.

I do believe that initially at accident on September 14, 2016, he did have sprains and strains of cervical spine and lumbar spine and they over time have resolved. The accident was the cause of the sprains and strains of cervical spine and lumbar spine, but they have gone on to resolve. I do believe that he does have chronic back and neck pain which were pre-existing condition in this regard and over time he has also gone on to have some worsening degenerative findings to the cervical and lumbar spine, which is part of normal aging process. Taking this into account, I believe that at this point he needs no further medical intervention or further treatment or surgical interventions or medications in regard to the incident dated September 14, 2016. Also, at this point I would note that he does not need any transportation assistance, nor any household assistance, nor any attendant care, nor any need for a nurse manager, nor any need for medications due to his due to his [sic] lack of objective findings today on examination.

I do believe he has returned back to pre-injury status before the accident. Also I believe that he has reached maximum medical improvement at this point. He does not have any permanent disabilities or any temporary disability or restrictions at this point.

In opposing the motion, plaintiff argued that the motor vehicle accident had caused an aggravation or worsening of his pre-existing cervical spine condition. Plaintiff noted that the CT scan from the day after the accident showed more severe impairment of his cervical spine, including a new disc herniation at C3-C4, that had not previously been documented in pre-accident medical records. Plaintiff also appeared to assert that the evidence showed that the accident caused him to suffer new or aggravated injuries to his lumbar spine. Plaintiff maintained that his

---

[5] This report was attached to defendant's reply to plaintiff's response to the summary disposition motion.

deposition testimony established that he was unable to perform tasks and engage in activities as he had before the accident.

Following a hearing on the motion, the trial court issued a written opinion and order granting defendants' motion for summary disposition. First, the trial court noted the medical evidence of plaintiff's pre-existing neck and back pain and concluded that based on the record evidence, "the only injury that can be argued to have been caused by the accident is a cervical strain but the evidence is clear that none of the serious injuries and impairments to Plaintiff's back were caused by the accident." The trial court next addressed the threshold injury issue. The court determined that with respect to whether the accident caused an objectively manifested impairment, the evidence viewed in a light most favorable to plaintiff supported a conclusion that "the car accident was the cause of a cervical strain based on the reports of Dr. Bazo and Dr. Ikram." On the question whether plaintiff's general ability to lead his normal life was affected, the trial court concluded that "Plaintiff has failed to come forward with sufficient evidence to show that the cervical strain affected his ability to lead a normal life as opposed to the trajectory of his degenerative pre-existing conditions." In support of this conclusion, the trial court cited record evidence of plaintiff's pre-accident history of treatment for back pain and stated:

> Plaintiff's pre-accident and post-accident life are the same and any changes cannot be attributed to the cervical strain but are more likely caused by the degenerative conditions that Plaintiff had before the accident.

The trial court subsequently denied plaintiff's motion for reconsideration. This appeal followed.

## III. STANDARD OF REVIEW

An appellate court "reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). In evaluating a motion for summary disposition under MCR 2.116(C)(10), a court must "consider[] affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id.* at 120 (citation omitted). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## IV. ANALYSIS

In granting defendants' motion for summary disposition, the trial court first determined that "the only injury that can be argued to have been caused by the accident is a cervical strain but the evidence is clear that none of the serious injuries and impairments to Plaintiff's back were caused by the accident."

Causation is one of the elements necessary to establish a negligence claim. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). The plaintiff must "prove that the

driver's conduct was both a cause in fact and a legal cause of his injuries." *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000). It is apparent from the trial court's written opinion and order that its causation determination was only focused on factual causation, and we thus focus our analysis accordingly. Establishing factual causation "requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Ray v Swager*, 501 Mich 52, 63; 903 NW2d 366 (2017) (citation and some quotation marks omitted). Regarding the aggravation of pre-existing conditions in automobile negligence cases, our Supreme Court has held that "[r]egardless of the preexisting condition, recovery is allowed if the trauma caused by the accident triggered symptoms from that condition." *Wilkinson*, 463 Mich at 395.

Here, plaintiff's medical records from his hospital treatment on the day after the accident indicated that he had been in a motor vehicle accident and diagnosed with neck sprain, back sprain, and cervical disc herniation. A CT scan of plaintiff's cervical spine was performed that same day and the interpreting doctor, Ahmed, documented in his CT scan report that he found a large disc herniation in plaintiff's cervical spine at C3-C4 that could be an acute posttraumatic injury. Although there was evidence that plaintiff had received medical treatment for back and neck pain before the subject accident occurred, defendants do not cite any evidence in the record that this cervical disc herniation was actually present before the motor vehicle accident. Additionally, Reina's diagnosis of plaintiff's injuries included strains of muscles and tendons in the neck, as well as acute pain due to trauma and intravertebral disc disorders. Reina also disabled plaintiff from working for a period of time due to neck and upper back pain. Bazo disabled plaintiff from work for 10 days due to his cervical strain. Treatment records from plaintiff's physical therapy appointment in October 2016 indicate that he was being treated for cervical pain, including two herniated discs.

One of defendant's medical examiners, Khalid, expressly disagreed with Ahmed's findings and opined that plaintiff only suffered from chronic and degenerative conditions in his cervical and lumbar spine. Khalid opined that the cervical disc herniation at C3-C4 was also a chronic condition and that there was no objective evidence of acute objective injury. Ikram, who was defendant's other medical examiner, opined that plaintiff had suffered strains and sprains of the cervical and lumbar spine that *were caused by the accident* but that those initial sprains or strains had "resolved" by the time he examined plaintiff in 2020. Ikram further opined that plaintiff also had chronic degenerative conditions that were present before the accident.

There is no question that plaintiff suffered from some degree of pre-existing and degenerative conditions in his neck and back for which he had received treatment before the subject motor vehicle accident. However, there was conflicting evidence creating a genuine issue of material fact regarding whether there were additional new impairments or aggravations of pre-existing conditions, that would not have occurred but for the motor vehicle accident such that summary disposition on this issue was improper. "Although causation cannot be established by mere speculation, a plaintiff's evidence of causation is sufficient at the summary disposition stage to create a question of fact for the jury if it establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support." *Patrick v Turkelson*, 322 Mich App 595, 617; 913 NW2d 369 (2018) (quotation marks and citations omitted). "Causation is an issue that is typically reserved for the trier of fact unless there is no dispute of material fact." *Id*. at 616.

Here, the trial court erred by essentially weighing the relative strength of evidence and resolving factual conflicts to determine that only cervical strain could arguably be attributed to the motor vehicle accident. *Id*. at 605 ("[I]t is well settled that the circuit court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition. Moreover, a court may not make findings of fact; *if the evidence before it is conflicting*, summary disposition is improper.") (quotation marks and citations omitted; alteration in original).

Turning to the threshold injury issue, a plaintiff seeking noneconomic damages in an automobile negligence action is required pursuant to Michigan's no-fault act, MCL 500.3101 *et seq*., to establish that the accident caused a threshold injury: "A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle *only if* the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1) (emphasis added); see also *McCormick*, 487 Mich at 189-190.

Here, the issue is whether plaintiff suffered a serious impairment of body function. MCL 500.3135(5) provides:

> (5) As used in this section, "serious impairment of body function" means an impairment that satisfies all of the following requirements:
>
> (a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.
>
> (b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.
>
> (c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

As our Supreme Court stated in *McCormick*, there are three necessary prongs for establishing a "serious impairment of body function": "(1) an objectively manifested impairment (observable or perceivable from actual symptoms or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person's general ability to lead his or her normal life (influences some of the plaintiff's capacity to live in his or her normal manner of living)." *McCormick*, 487 Mich at 215.

Here, the trial court determined that plaintiff had suffered an objectively manifested impairment in the form of a cervical strain, reaching this conclusion on the basis of its earlier finding that this was the only injury that had been caused by the accident. As we have already discussed, there were genuine issues of material fact regarding the causation of plaintiff's objectively perceivable impairments. Hence, the trial court further erred by relying on its erroneous causation determination to similarly limit its analysis of the threshold injury question to

a cervical strain. Plaintiff's medical records, including imaging reports, provided evidence of "an impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function" such that there was a question of fact on the issue of objectively manifested impairment. *Id*. at 196; see also MCL 500.3135(5)(a).

With respect to the third prong, there was evidence that plaintiff was employed working in construction at the time of the accident but was disabled from work by his treating physicians for at least some period of time following the accident, and plaintiff provided testimony in his deposition about activities that he could no longer perform—or was unable to perform for at least some period of time following the accident without the assistance of a cane or brace that he did not previously need—as a result of the impairments he suffered in the accident. As the *McCormick* Court explained, the statute "merely requires that a person's general ability to lead his or her normal life has been *affected*, not destroyed"; "only requires that some of the person's *ability* to live in his or her normal manner of living has been affected, not that some of the person's normal manner of living has itself been affected"; and "does not create an express temporal requirement as to how long an impairment must last in order to have an effect on 'the person's general ability to live his or her normal life.' " *Id*. at 202-203; see also MCL 500.3135(5)(c). The trial court in this case erred by ignoring plaintiff's evidence of the effect of his impairments on his general ability to lead his normal life and instead concluding that there was no question of fact that plaintiff's life was exactly the same after the accident as it had been before.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff having prevailed in full is entitled to costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ Michael J. Kelly